

I N  T H E

# Court of Appeals of Indiana

Christopher Delgado,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Dec 02 2024, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

December 2, 2024

Court of Appeals Case No.
24A-CR-708

Appeal from the Porter Superior Court

The Honorable Mary DeBoer, Judge

Trial Court Cause No.
64D05-2205-F5-004232

**Opinion by Judge Felix**
Judges Weissmann and Foley concur.

**Felix, Judge.**

## Statement of the Case

A law enforcement officer attempted to execute an outstanding arrest warrant on Christopher Delgado after noticing him walking on the side of the road. Instead of complying with the officer, Delgado gave a false name. When the officer attempted to arrest Delgado, Delgado repeatedly punched the officer in the head. With the help of a bystander, the officer was able to arrest Delgado, who was later charged with and convicted of battery, resisting law enforcement, and false informing. The trial court sentenced Delgado to 12 years of incarceration, with 2 of those years suspended to probation. Delgado now appeals and raises four issues for our review:

1. Whether Delgado's convictions for battery and resisting law enforcement violate Indiana's protection against double jeopardy;
2. Whether the State presented sufficient evidence to support Delgado's conviction for false informing;
3. Whether the trial court abused its discretion by admitting certain evidence at trial; and
4. Whether certain probation conditions are unconstitutionally vague or otherwise erroneous.

We affirm in part, reverse in part, and remand with instructions.[1]

---

[1] On November 6, 2024, we held oral argument in this case at Indian Creek High School in Trafalgar, Indiana. We thank the faculty and staff of the school for their hospitality, the students who attended the oral argument for their thought-provoking questions after the argument, and counsel for both parties for the quality of their arguments and for remaining after the argument to answer the students' questions.

## Facts and Procedural History

[3]     On the afternoon of May 16, 2022, Corporal Jamison Smith of the Porter County Sheriff's Department was driving his fully marked patrol vehicle southbound on Swanson Road when he spotted Delgado walking northbound on the east side of Swanson Road. Delgado was wearing a white T-shirt and had a backpack. Corporal Smith recognized Delgado as "somebody that possibly had a warrant," Tr. Vol. III at 73, but Corporal Smith could not recall Delgado's name. Corporal Smith stopped nearby so he could research a person he knew to be associated with Delgado to determine Delgado's name, which was successful. Corporal Smith then pulled his patrol vehicle next to Delgado and said, "Chris, I need to talk to you." *Id.* at 75. Delgado responded, "I am not Chris." *Id.* So Corporal Smith showed Delgado a photo from the outstanding arrest warrant and asked Delgado to confirm if the person in that picture was him. Delgado said it was not. Corporal Smith again told Delgado that he needed to speak with him, pulled over, and got out of his patrol vehicle to do so.

[4]     Delgado walked to the front of Corporal Smith's patrol vehicle, and Corporal Smith, who was standing approximately five to seven feet away from Delgado, told him, "I know you're Christopher Delgado," and "made it very clear" that Delgado was "not free to leave." Tr. Vol. III at 78. Delgado again said, "I am not Chris," so Corporal Smith asked, "[W]ell, then who are you?" *Id.* Delgado said his name was "Mark or Mike." *Id.* Delgado could not produce any identification when Corporal Smith asked him for one, but he did provide a

Social Security number. Corporal Smith responded, "Chris, I know who you are." *Id.* at 79. At this point, Delgado "began to get very agitated that [Corporal Smith] was calling him Chris," telling Corporal Smith, "[S]top f[*]cking calling me Chris. I am not Chris." *Id.*

[5] Delgado then indicated that he was leaving. Corporal Smith told him he could not leave. Nonetheless, Delgado began to walk away from Corporal Smith, who "pushed" or "stiff arm[ed]" Delgado "to stop him from walking past" and told Delgado, "You're not f[*]cking leaving, get back to my car." Tr. Vol. III at 123. Delgado responded by taking off his backpack and asking Corporal Smith, "What are you going to f[*]cking do about it[?]" *Id.* at 79. Delgado took "a fighting stance, balling his fists up." *Id.* at 80. Corporal Smith radioed for back up and then attempted to cuff Delgado, grabbing for Delgado's right arm as he was facing Corporal Smith. Delgado managed to "shrug . . . off" Corporal Smith and then "delivered . . . three punches in a row that landed directly on [Corporal Smith's] forehead" before stepping back into the middle of the road. *Id.* at 81. Delgado's punches "were pretty quick and brisk," leaving Corporal Smith with little to no time "to get out of the way." *Id.* at 115. Once Corporal Smith "regained [his] composure," he again tried to gain control of Delgado's arms, this time attempting to bear hug him, but Delgado "was able to step back and deliver more punches," hitting Corporal Smith in the forehead three more times. *Id.* at 81–82. After landing these last three punches, Delgado yelled, "[C]ome on you p[*]ssy." *Id.* at 82.

[6]     William Cassoday, a longtime Brazilian jiu-jitsu practitioner and former bouncer, was driving on Swanson Road and saw Delgado punching Corporal Smith. Cassoday pulled over and managed to put Delgado in a chokehold before moving him to the side of the road. At this point, Corporal Smith "was able to put [Delgado] into handcuffs with no issue." Tr. Vol. III at 85. Backup arrived soon thereafter, and Delgado was taken to jail.

[7]     Immediately after the incident, Corporal Smith had swelling over his right eyebrow where Delgado had punched him. Corporal Smith experienced headaches and continued swelling for approximately two days after the incident; he did not seek medical treatment.

[8]     During the entirety of his encounter with Delgado, Corporal Smith was wearing a black tactical vest with a metal Porter County Sherriff's star on the front and the word "sheriff" on the front and back. Corporal Smith was not wearing his body camera before taking Delgado into custody; instead, it was charging in his patrol vehicle.

[9] The State charged Delgado with battery as a Level 5 felony[2]; resisting law enforcement as a Class A misdemeanor[3]; and false informing as a Class A misdemeanor[4]. The State also alleged that Delgado was a habitual offender[5].

[10] At Delgado's jury trial in January 2024, both Corporal Smith and Cassoday testified to the events as described above. The State also offered and the trial court admitted photos taken immediately after the incident that showed a "goose egg" above Corporal Smith's right eyebrow. Tr. Vol. III at 114. Delgado testified in his own defense, and at the beginning of his direct examination and again on cross examination, he admitted that he had several prior convictions for burglary and theft, which he agreed on cross examination were "crimes of dishonesty," *id.* at 178–79.

[11] During his testimony, Delgado presented a different version of events than Corporal Smith and Cassoday. According to Delgado, he was walking along Swanson Road when he saw an "officer" drive by him, but he did not think much of it "because nothing [was] wrong. And then, all of a sudden, I had him kind of nudging me off the side of the road and he rolls down his window. And he's calling me David. . . . He says David twice. I tell him I am not David." Tr. Vol. III at 165–66. Delgado testified that he explained to Corporal Smith

---

[2] Ind. Code § 35-42-2-1(c)(1), (g)(5)(A) (eff. July 1, 2020, to June 30, 2023).

[3] *Id.* § 35-44.1-3-1(a)(1) (eff. July 1, 2021, to June 30, 2024).

[4] *Id.* § 35-44.1-2-3(d)(1), (e)(1) (eff. July 1, 2021, to June 30, 2024).

[5] *Id.* § 35-50-2-8.

that David was his uncle and had recently passed away.  Delgado did not recall Corporal Smith showing him a photo and stated, "the way [Corporal Smith] was saying David was just completely aggressive with me from the jump," *id.* at 168.  Delgado testified that Corporal Smith "didn't look like an officer" because he "didn't have browns on," *id.* at 169, and that he did not see a police badge on Corporal Smith's vest or other indications that Corporal Smith was a law enforcement officer.  Delgado also stated that he "didn't even think [Corporal Smith] was on duty," *id.* at 171, and that he knew the vehicle Corporal Smith was driving was a police vehicle.

[12]  Delgado testified that Corporal Smith pulled over and that he and Corporal Smith stood approximately two to three feet apart at the front of Corporal Smith's vehicle where Corporal Smith began asking him questions and again addressed him as David.  Delgado stated that he told Corporal Smith again that he was not David, at which point Corporal Smith asked Delgado if he was Chris.  Delgado claimed that he explained to Corporal Smith that he has a cousin whose name is also Christopher Delgado who looks like him and lives in the area, but the cousin goes by "Chris" while he goes by "Christopher."  Tr. Vol. III at 170–71.  According to Delgado, he then attempted to give Corporal Smith his Social Security number and Corporal Smith began "pushing me and tells me to get to the back -- to get to the front of his f[*]cking car."  *Id.* at 173.  Delgado testified that Corporal Smith pushing him "triggered a response.  I am fight or flight."  *Id.*  Delgado claimed that "everything still is kind of fuzzy from there."  *Id.* at 174.  Delgado recalled being choked, but stated, "I don't know

when that other guy had a chance to choke me.  I have no idea.  This guy choke me first.  I had a backpack on me.  I wake up on the side of the road.  My backpack ain't on me no more."  *Id.*

[13]  Delgado testified that he "never touched" Corporal Smith, Tr. Vol. III at 175, he "did not punch that officer," *id.* at 202, and that he did not have any injuries on his hands that would have been consistent with punching someone.  Delgado also testified that he did not remember Corporal Smith telling him that he was not free to leave; he did not tell Corporal Smith that he was leaving; he did not remember responding to this by saying, "What are you going to do about it," *id.* at 193, 199; and he did not remember dropping his backpack.  When the State asked Delgado if "What are you going to do about it" sounded like something he would say, Delgado responded, "Absolutely not.  . . .  I don't like confrontation."  *Id.* at 199–200.  When the State came back to this topic later during cross examination, Delgado reiterated that he does not like confrontation; the State then sought to impeach Delgado by asking him questions about and playing another officer's body camera video depicting Delgado's behavior after he was handcuffed (the "Post-Arrest Video").  The State also wanted to use the Post-Arrest Video to impeach Delgado's testimony that he did not hit Corporal Smith.  Delgado objected to the introduction of the Post-Arrest Video as improper impeachment.  The trial court overruled Delgado's objection and allowed the State to use the video to impeach

Delgado.[6]  The trial court then granted the parties' request for it to instruct the jury that such evidence was not substantive.

[14]   The State played the first few minutes of the Post-Arrest Video for the jury, which starts when another officer arrived on scene and ends when Delgado was placed in a squad car.  The video shows Corporal Smith on top of a handcuffed Delgado on the side of Swanson Road.  After that, Delgado can be heard saying to Corporal Smith, "I'll thump your [*]ss out again, d[*]ckhead."  Post-Arrest Video at 00:35–00:39.  Delgado also stated, "He f[*]cking choked me, and I hit him.  That's what happened," *id.* at 00:52–00:57, and "You need to teach your officers how to f[*]cking be respectful," *id.* at 01:04–01:07.  Delgado repeatedly called Corporal Smith a "racist motherf[*]cker," *id.* at 01:41–01:44, 02:17–02:19, and repeatedly accused Corporal Smith of calling him a "sp[*]c," *id.* at 01:16–01:18, 01:20–01:22, 01:58–02:00.  When Corporal Smith got off Delgado's back and helped him to his feet, Delgado told him, "You got beat up, didn't you?  Let's go again, motherf[*]cker.  You ain't nothing."  *Id.* at 01:30–01:40.  Before the officers put Delgado in the squad car, Delgado called Corporal Smith a "rat wh[*]re" and stated, "I ain't no snitch."  *Id.* at 01:46–01:51.  Delgado then resisted the officers' attempts to get him into the squad car.

---

[6] During a bench conference, the trial court suggested that the Post-Arrest Video was relevant to the charged offenses; however, the trial court did not admit the video as substantive evidence, instead permitting its use only for impeachment purposes pursuant to the parties' request.

[15] After showing the above-described portion of the Post-Arrest Video to the jury, the State asked Delgado if he remembered making several of the statements heard in the video. Delgado testified that he remembered saying he was not a snitch and telling the officers they needed to be respectful, but he did not remember acknowledging that he hit Corporal Smith.

[16] During closing arguments, the State contended that this case hinged on a credibility determination: "[Y]ou have the jury instruction for judging the credibility of witnesses. Because that's what this comes down to, you are judging the credibility of the officer and Will Cassoday, and you're judging the credibility of the Defendant." Tr. Vol. IV at 38. In making this argument, the State referenced the Post-Arrest Video as an example of Delgado's alleged lack of credibility, and the trial court allowed the State to do so over Delgado's objection.

[17] The jury found Delgado guilty on all three counts, and Delgado admitted to being a habitual offender. The trial court sentenced Delgado to a total of 12 years executed at the Indiana Department of Correction, with 2 of those years suspended to probation. After imposing this sentence, the trial court asked Delgado if he wanted the trial court to "read him the rules of formal probation at this time," and Delgado waived that reading. Tr. Vol. IV at 108. Delgado now appeals.

## Discussion and Decision

### 1. Delgado's Convictions for Resisting Law Enforcement and Battery Violate Indiana's Protection Against Substantive Double Jeopardy

Delgado contends his convictions for Level 5 felony battery and Class A misdemeanor resisting law enforcement are contrary to Indiana's protections against double jeopardy. We review such questions de novo. *A.W. v. State*, 229 N.E.3d 1060, 1064 (Ind. 2024) (citing *Wadle v. State*, 151 N.E.3d 227, 237 (Ind. 2020); *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020)).

Indiana's protection against substantive double jeopardy prohibits "multiple convictions for the same offense in a single proceeding." *A.W.*, 229 N.E.3d at 1066. To determine if a substantive double jeopardy violation has occurred, we apply a "three-part test based on statutory sources." *Id.* First, we look to the statutory language of the offenses at issue; if that language "clearly permits multiple punishments," then "there is no violation of substantive double jeopardy" and we end our analysis. *Id.* (quotation marks omitted). Second, we assess whether the charges are inherently included or factually included as charged. *Id.* at 1068. When "'neither offense is an included offense of the other (either inherently or as charged) there is no violation of double jeopardy and the analysis ends'—full stop." *Id.* at 1067 (quoting *Wadle*, 151 N.E.3d at 248). Third, we "examine the facts underlying those offenses, as presented in the charging instrument and as adduced at trial." *Id.* at 1071 (emphasis omitted) (quoting *Wadle*, 151 N.E.3d at 249).

[20] Here, Delgado and the State agree that the first step is not dispositive, so we proceed to the second step. At this step, we first "apply our included-offense statutes" to determine if one offense is inherently included it the other. *A.W.*, 229 N.E.3d at 1066 (quoting *Wadle*, 151 N.E.3d at 248). Delgado does not argue that the Class A misdemeanor resisting law enforcement charge is *inherently* included in the Level 5 felony battery charge, so we assume for purposes of this opinion that it is not and proceed to determine whether the former is *factually* included in the latter, *see id.* at 1067.

[21] As instructed by the majority in *A.W.*: "[W]hen assessing whether an offense is factually included, a court may examine only the **facts as presented on the face of the charging instrument**. This includes examining the 'means used to commit the crime charged,' which must 'include all of the elements of the alleged lesser included offense.'" 229 N.E.3d at 1067 (emphasis in original) (quoting *Wadle*, 151 N.E.3d at 251 n.30). This assessment also requires us to determine if there is any ambiguity in the charging informations. *Id.* at 1070. If ambiguities exist, we "must construe those ambiguities in the defendant's favor, and thus find a presumptive double jeopardy violation." *Id.* at 1069.

[22] To determine if the charges are factually included or whether any ambiguity exists here, we review the two charging informations. First, the charging information for battery reads in relevant part as follows:

> [O]n **5/16/2022** in Porter County, Indiana, **CHRISTOPHER D DELGADO did knowingly or intentionally** . . . touch [O]fficer [S]mith in a rude, insolent or angry manner, to wit:

> [C]hristopher resisted arrest by punching [O]fficer [S]mith in the head several times . . . resulting in bodily injury to a public safety official while the official is engaged in the official's official duty. . . .

Appellant's App. Vol. II at 18 (emphases in original). Second, the charging information for resisting law enforcement reads in relevant part as follows:

> [O]n **5/16/2022** in Porter County, Indiana, **CHRISTOPHER D DELGADO did knowingly or intentionally** . . . forcibly resist, obstruct or interfere with a law enforcement officer while said officer was lawfully engaged in his duties. . . .

*Id.* at 21 (emphases in original). At a minimum, the State concedes that these charging informations are ambiguous.[7] Appellee's Br. at 22. We conclude there is a presumptive double jeopardy violation, *see A.W.*, 229 N.E.3d at 1069, and move to the third and final step of our analysis.

[23] Under step three, the State bears the burden of rebutting the presumptive double jeopardy violation by using the facts presented at trial to demonstrate a "distinction between what would otherwise be two of the 'same' offenses." *A.W.*, 229 N.E.3d at 1071. It is at this step that we "probe the underlying facts—as presented in the charging instrument and adduced at trial—to determine whether a defendant's actions were 'so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single

---

[7] Even had the State not conceded ambiguity, it is not too far a stretch to conclude that the charging information for battery factually included the charge of resisting law enforcement.

transaction.'" *Id.* (quoting *Wadle*, 151 N.E.3d at 249). "If the underlying facts reveal the two offenses are indeed 'separate,'" there is no double jeopardy violation. *Id.* (quoting *Wadle*, 151 N.E.3d at 249). If, however, the "facts show only a single continuous crime, and one statutory offense is included in the other," the State may not obtain cumulative convictions. *Id.* (quoting *Wadle*, 151 N.E.3d at 249).

[24] Here, the facts presented at trial indicate that Corporal Smith twice tried to place Delgado in handcuffs, and Delgado punched Corporal Smith in the head after both of those attempts. First, Corporal Smith grabbed for Delgado's right arm, and Delgado responded by hitting Corporal Smith three times. Second, Corporal Smith tried to bear hug Delgado, and Delgado again responded by hitting Corporal Smith three times. The time between these two events was minimal at best—only one to two minutes passed between the first time Corporal Smith reached for Delgado to arrest him until Cassoday took Delgado to the ground.[8] These events all occurred in essentially the same place— Swanson Road in front of Corporal Smith's vehicle. Delgado had the same principal purpose in pulling away from and punching Corporal Smith both times—to evade arrest.[9] The information for the battery charge reflects this compression of time, location, and principal purpose: "[C]hristopher resisted

---

[8] At oral argument, the State conceded that only one to two minutes passed as described herein.

[9] At oral argument, the State argued that the before the second round of punches, Delgado was not trying to evade arrest as much as he was wanting to fight Corporal Smith. We do not read the record in the same light.

arrest by punching [O]fficer [S]mith in the head several times." Appellant's App. Vol. II at 18 (emphasis in original).

[25] Furthermore, during opening argument, the State told the jury that Delgado "forcibly resisted" arrest "[n]ot only by pulling away, but also by punching [Corporal Smith] in the head." Tr. Vol. III at 63–64. There was, in fact, evidence that both times Corporal Smith attempted to arrest Delgado, Delgado pulled away from Corporal Smith before punching him. The State does not make the same argument on appeal. Additionally, during closing argument, the State argued only that although there was "overlap" between the battery and resisting charges, there were "additional elements that separate the two," Tr. Vol. IV at 22–23; the State did not elaborate on what those distinguishing elements were.[10] The State's opening and closing arguments here are indicative of the lack of separation between the battery and resisting law enforcement charges.

[26] Based on the foregoing, we conclude the facts as presented in the charging information and adduced at trial show that the acts underlying Delgado's battery and resisting arrest convictions were so compressed in terms of time, place, and principal purpose that they draw from the same transaction under our double jeopardy analysis. That is, the State has not carried its burden of rebutting the presumptive double jeopardy violation by using the facts presented

_____

[10] While it is true that the statutory elements are different, the State essentially merged the two statutes by its wording of the charging information for battery.

at trial to demonstrate a "distinction between what would otherwise be two of the 'same' offenses." *A.W.*, 229 N.E.3d at 1071. Consequently, Delgado's conviction for Class A misdemeanor resisting law enforcement is included in his conviction for Level 5 felony battery, and those convictions violate our state constitutional protection against substantive double jeopardy.

## 2. The State Did Not Present Sufficient Evidence to Support Delgado's Conviction for False Informing

[27] Delgado argues that the State presented insufficient evidence at trial to support his conviction for false informing as a Class A misdemeanor. Our Supreme Court has explained our standard of review for such a claim as follows:

> Sufficiency-of-the-evidence claims trigger a deferential standard of review in which we "neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury." *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018). A conviction is supported by sufficient evidence if "there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). In conducting that review, we consider only the evidence that supports the jury's determination, not evidence that might undermine it. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024).

*Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024).

[28] In order to convict Delgado of Class A misdemeanor false informing under Indiana Code section 35-44.1-2-3, the State had to prove beyond a reasonable doubt that Delgado (1) gave a false report of the commission of a crime or false

information to a law enforcement officer that relates to the commission of a crime, (2) knew the report or information to be false, and (3) this false report or information substantially hindered a law enforcement process or resulted in harm to another person. *See* I.C. § 35-44.1-2-3(d)(1), (e)(1)(A)–(B). Delgado challenges only the third element, arguing that the false report or information he gave did not substantially hinder a law enforcement process or result in harm to another person.

[29] In particular, Delgado argues that denying his identity and providing Corporal Smith a false name did not result in harm to another person because the only harm the State established was the result of the battery and did not substantially hinder a law enforcement process because Corporal Smith "repeatedly testified" that he knew who Delgado was despite the false information, Appellant's Br. at 27. The State does not contend that Delgado's denial of his identity resulted in harm to another person. Therefore, the State was required to prove Delgado's actions substantially hindered a law enforcement process.

[30] The State contends that "Delgado's decision to deny his identity and provide [Corporal] Smith with a different name . . . substantially hindered [Corporal Smith]'s ability to effectuate that warrant for Delgado's arrest." Appellee's Br. at 24. In support, the State cites to this court's decision in *Jones v. State*, 774 N.E.2d 957 (Ind. Ct. App. 2002). In *Jones*, the defendant was involved in a car accident but denied there had been a collision when questioned by law enforcement at the scene. *Id.* at 964. Witnesses provided statements to the contrary. *Id.* The next day, the defendant admitted to law enforcement that

there had been a collision. *Id.* The conflicting stories delayed law enforcement's processing of the accident scene, and it prevented an investigation of potentially criminal conduct. *Id.* Another panel of this court determined this was sufficient to show that the defendant's false report or information substantially hindered a law enforcement process. *Id.* at 964–65.

[31] Here, the probative evidence and reasonable inferences supporting the verdict show that Delgado denied his identity and gave Corporal Smith a false name, and this delayed—that is, hindered—Corporal Smith in executing Delgado's outstanding arrest warrant; however, the evidence does not support the conclusion that the law enforcement process was *substantially* hindered. To conclude otherwise on these facts would essentially render meaningless the General Assembly's use of the word "substantially" in Indiana Code section 35-44.1-2-3(e)(1)(A). When reading statutes, we must "give effect to every word and 'eschew those [interpretations] that treat some words as duplicative or meaningless.'" *Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021) (alteration in original) (quoting *Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 836 (Ind. 2020)). We also give the words and phrases used in statutes "their plain, or ordinary and usual," meaning. I.C. § 1-1-4-1(1); *see also Morales v. Rust*, 228 N.E.3d 1025, 1054 (Ind. 2024) (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dept.*, 62 N.E.3d 1192, 1195 (Ind. 2016)) ("When interpreting words in a statute, this Court's 'first task' is to assign words their 'plain meaning' . . . ."), *reh'g denied* (Apr. 22, 2024), *cert. denied*, -- S.Ct. --, 2024 WL 4426707 (U.S. Oct. 7, 2024).

"Substantially" originates from "substantial," which generally means "considerable in extent, amount, or value; large in volume or number," *Substantial*, BLACK'S LAW DICTIONARY (12th ed. 2024); "of, relating to, or involving substance; material," *id.*; "[o]f ample or considerable amount or size," *Substantial*, SHORTER OXFORD ENGLISH DICTIONARY (6th ed. 2007); "of real significance," *id.*; and "considerable in quantity[,] significantly great," *Substantial*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Here, the delay caused by Delgado denying his identity was a fraction of time. While there was a delay between Corporal Smith confronting Delgado and placing him under arrest, that delay was not a result of Delgado's dishonesty; it was a result of Delgado's physical attack on the officer. Any delay did not result in preventing law enforcement from an investigation, nor did it prevent the ultimate goal—arresting Delgado. Throughout his encounter with Delgado, Corporal Smith knew who Delgado was and knew Delgado had an outstanding arrest warrant. In other words, Delgado's denials of his identity and giving of a false name resulted in only an inconsequential delay. By contrast, in *Jones*, the defendant's false report or information caused an approximately one day delay in law enforcement's ability to process a scene and investigate potentially criminal conduct. 774 N.E.2d at 964–65.

[33] Based on the foregoing, the probative evidence and reasonable inferences supporting the verdict do not establish that Delgado's false information or report substantially hindered a law enforcement process. Accordingly, the State failed to present sufficient evidence to support Delgado's conviction for false

informing as a Class A misdemeanor.  Sufficient evidence was presented for the Delgado to be convicted of false informing as a Class B misdemeanor.  *See W.H. v. State*, 231 N.E.3d 900, 905 n.2 (Ind. Ct. App. 2024) (quoting *Alexander v. State*, 13 N.E.3d 917, 922 (Ind. Ct. App. 2014)), *trans. not sought*.

### 3. The Trial Court Did Not Abuse Its Discretion by Allowing the State to Play the Post-Arrest Video for the Jury

[34]   Delgado claims that the trial court abused its discretion in admitting certain evidence at trial.  We review rulings on admissibility of evidence for an abuse of discretion.  *Russell v. State*, 234 N.E.3d 829, 858 (Ind. 2024) (quoting *Conley v. State*, 972 N.E.2d 864 (Ind. 2012)), *cert. denied*.  "[W]e may affirm the trial court's decision on any basis supported by the record," *Means v. State*, 201 N.E.3d 1158, 1163 (Ind. 2023) (citing *Ramirez v. State*, 174 N.E.3d 181, 190 n.2 (Ind. 2021)), and we will reverse "only where the decision is clearly against the logic and effect of the facts and circumstances," *Russell*, 234 N.E.3d at 858 (quoting *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)).

[35]   Delgado specifically challenges the trial court's decision to allow publication of the Post-Arrest Video because he claims it was irrelevant, unfairly prejudicial, and improper impeachment evidence.  However, Delgado's statements in the Post-Arrest Video were admissible as statements of a party-opponent.  *See* Ind. Evid. R. 801(d)(2); *Means*, 201 N.E.3d at 1163 (citing *Ramirez*, 174 N.E.3d at 190 n.2).  For instance, in the Post-Arrest Video, Delgado admitted to hitting Corporal Smith, and those statements were relevant.  Any prejudice caused by seeing Delgado's conduct post-arrest was not substantially outweighed by its

probative value. While the Post-Arrest Video was used for impeachment purposes only, even if it had been admitted as substantive evidence, we would find no error. Accordingly, the trial court did not err by allowing the State to play the Post-Arrest Video for the jury.

## 4. Delgado's Challenges to his Probation Conditions Are Not Waived, and the Challenged Conditions Are Erroneous

Finally, Delgado contends three of his probation conditions are unconstitutionally vague or otherwise impermissible. Before we review those challenges, we first address the State's waiver argument.

### a. *Delgado Did Not Waive Appellate Review of His Probation Conditions*

The State contends that Delgado waived appellate review of his probation conditions by waiving formal reading of and not objecting to them. In support, the State cites this court's decisions in *Patton v. State*, 990 N.E.2d 511, 514 (Ind. Ct. App. 2013); *Hale v. State*, 888 N.E.2d 314, 319 (Ind. Ct. App. 2008); and *Stott v. State*, 822 N.E.2d 176, 179 (Ind. Ct. App 2005). Meanwhile, Delgado cites this court's decisions in *Meunier-Short v. State*, 52 N.E.3d 927, 936 (Ind. App. 2016), and *Bratcher v. State*, 999 N.E.2d 864, 874 (Ind. App. 2013), in support of his position that he has not waived this issue for our review.

We acknowledge that this court has issued differing opinions concerning whether a defendant's failure to object to probation conditions at the trial level waives appellate review of those conditions. In *Patton*, *Hale*, and *Stott*, three panels of this court held that the individual defendants had waived appellate

review of their probation conditions because they had not objected to those conditions at their sentencing hearings. *Patton*, 990 N.E.2d at 514; *Hale*, 888 N.E.2d at 319; *Stott*, 822 N.E.2d at 179. However, the *Patton*, *Hale*, and *Stott* panels still chose to review the defendants' challenges despite this holding. *Patton*, 990 N.E.2d at 515; *Hale*, 888 N.E.2d at 319; *Stott*, 822 N.E.2d at 179.

[39] By contrast, in *Meunier-Short* and *Bratcher*, two panels of this court relied on the reasoning set forth in *Piercefield v. State*, 877 N.E.2d 1213 (Ind. Ct. App. 2007), to hold that the individual defendants had not waived appellate review of their probation conditions despite not objecting thereto at their sentencing hearings. *Meunier-Short*, 52 N.E.3d at 936; *Bratcher*, 999 N.E.2d at 874. The *Piercefield* court concluded that an appeal of a probation condition is similar "to an appeal of a sentence, which we may review 'without insisting that the claim first be presented to the trial judge,'" 877 N.E.2d at 1218 (quoting *Kincaid v. State*, 837 N.E.2d 1008, 1010 (Ind. 2005)), and further concluded that a defendant's "signature on the probation terms does not serve as a waiver to challenge any terms on appeal," *id.*

[40] Like the panels in *Meunier-Short* and *Bratcher*, we agree with the logical reasoning of *Piercefield* and conclude that Delgado did not waive appellate review of his probation conditions despite his failure to object to those conditions and his choice to waive formal reading of them. Our conclusion is further bolstered by our Supreme Court's recent decision in *Spells v. State*, in which it held that "[n]o objection was required to preserve a challenge to [the defendant's] fine, because a fine, like restitution, is part of the sentence." 225

N.E.3d 767, 771 n.5 (Ind. 2024) (citing *Bell v. State*, 59 N.E.3d 959, 962 (Ind. 2016)). Probation conditions were part of Delgado's sentence here, so the same logic applies. Accordingly, we will review Delgado's challenges to his probation conditions.

### b. *All Three Challenged Probation Conditions Are Erroneous*

[41] "When criminal defendants receive probation, they 'agree to accept conditions upon their behavior in lieu of imprisonment.'" *Weida v. State*, 94 N.E.3d 682, 687 (Ind. 2018) (alterations omitted) (quoting *Bratcher*, 999 N.E.2d at 873). The stakes for a probationer are "high": "If a probationer violates even one condition, he risks probation revocation and return to jail." *Id.* Even though "probationers 'do not enjoy the same constitutional protections as law-abiding citizens,'" the conditions of their probation may not unduly intrude on their constitutional rights, *id.* (quoting *Bratcher*, 999 N.E.2d at 873), and "must describe with clarity and particularity the misconduct that will result in penal consequences," *id.* (quoting *Hunter v. State*, 883 N.E.2d 1161, 1163 (Ind. 2008)).

[42] Delgado specifically challenges three of his probation conditions: (i) the condition requiring him to avoid "individuals of bad reputation" and to "not associate with anyone who is likely to influence me to commit any crime," Appellant's App. Vol. II at 221, (the "Bad Reputation & Influence Condition"); (ii) the condition requiring him to avoid "[f]ormer inmates of Penal Institutions," *id.*, (the "Inmate Condition"); and (iii) the condition requiring him to "always consult with my Probation Officer and obtain his/her written permission before obtaining a Driver's License," *id.* at 220, (the "Driver's

License Condition"). We address Delgado's arguments regarding each of these conditions in turn.

### i. The Bad Reputation & Influence Condition Is Unconstitutionally Vague

Delgado argues that the Bad Reputation & Influence Condition is unconstitutionally vague. "[T]o the extent a defendant challenges a probation condition on constitutional grounds (either a vagueness or as-applied challenge), our review is de novo." *Weida*, 94 N.E.3d at 687 (citing *Smith v. State*, 8 N.E.3d 668, 676 (Ind. 2014)). When a defendant challenges a probation condition as unconstitutionally vague—that is, the defendant claims "the condition lacks the requisite clarity and particularity"—we evaluate that condition using the same standard we use to evaluate criminal statutes for vagueness. *Id.* at 688 (citing *Hunter*, 883 N.E.2d at 1163). "We will find a probation condition unconstitutionally vague 'only if individuals of ordinary intelligence would not comprehend it to adequately inform them of the conduct to be proscribed.'" *Id.* (quoting *Patton v. State*, 990 N.E.2d 511, 516 (Ind. Ct. App. 2013)) (citing *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007)). Like criminal statutes, probation conditions "sufficiently inform probationers of restricted actions when they identify 'the **generally** proscribed conduct.'" *Id.* (emphasis in original) (quoting *Patton*, 990 N.E.2d at 516) (citing *Brown*, 868 N.E.2d at 467). "Fastidious specificity is not required. In other words, probation conditions 'need not list, with itemized exactitude, every item of conduct that is prohibited.'" *Id.* (quoting *Patton*, 990 N.E.2d at 516).

Furthermore, in considering a vagueness challenge, we look to only "the facts and circumstances of the case before us." *Weida*, 94 N.E.3d at 688 (citing *Brown*, 868 N.E.2d at 467). We will not consider "hypothetical situations that might demonstrate vagueness." *Id.* (quoting *Patton*, 990 N.E.2d at 516). We also "take the challenged probation provisions or language in context, not in isolation." *Id.* (citing *Brown*, 868 N.E.2d at 467).

Delgado specifically claims the Bad Reputation & Influence Condition lacks the requisite clarity and particularity to put him on notice of "the specific people that he must avoid." Appellant's Br. at 29. In support, Delgado relies primarily on this court's decision in *McCarty v. State*, 94 N.E.3d 350 (Ind. Ct. App. 2018). In *McCarty*, the defendant challenged a term of his probation that required him to "avoid persons and places of harmful character, or a person who is likely to influence you to commit a crime." *Id.* at 355. The *McCarty* court concluded that "person and places of harmful character" were "subjective terms" and "not readily defined," so that provision was impermissibly vague. *Id.*

In reaching this conclusion, the *McCarty* court relied heavily on *Clemons v. State*, 83 N.E.3d 104 (Ind. Ct. App. 2017), *trans. denied*. In *Clemons*, the defendant argued the following probation condition was unconstitutionally vague: "You shall not associate with any person of bad character or reputation or with any person who is likely to influence you to commit a crime or crimes." *Id.* at 107. The *Clemons* court determined this condition was vague, stating:

> The condition does not define what "associate" or "bad character or reputation" mean in this context, nor is it clear how to identify

> a person who could "influence" Clemons to commit a crime. Because each of the terms in this condition is subjective, the condition fails to inform Clemons what conduct would subject her to revocation of her probation.

*Id.* at 109.

[47] The State argues that when read in the context of the other probation conditions, the Bad Reputation & Influence Condition forbids Delgado only from associating with "individuals previously or currently involved in criminal activity or individuals who would encourage Delgado to return to criminal activity." Appellee's Br. at 28. While it is true that the other probation conditions generally prohibit Delgado from associating with persons on probation, on parole, or who were previously incarcerated, the inclusion of those specific prohibitions does not adequately define a person of "bad reputation" or who might "influence" Delgado to engage in criminal activity.

[48] Therefore, reading the Bad Reputation & Influence Condition in the context of the other probation conditions, we conclude that the Bad Reputation & Influence Condition suffers from the same subjectivity and lack of definition as the probation conditions at issue in *Clemons* and *McCarty*. We thus agree with Delgado that they are impermissibly vague.

### ii. The Inmate Condition Is Not Reasonably Related to the Goals of Probation

[49] Delgado also claims that the Inmate Condition reaches beyond what is reasonably necessary to rehabilitate him. Trial courts have "broad discretion in

fashioning defendants' probation conditions." *Weida*, 94 N.E.3d at 687 (citing *Hevner v. State*, 919 N.E.2d 109, 113 (Ind. 2010)). We will disturb a trial court's probation order only if the trial court abused its discretion. *Id.* (citing *Bailey v. State*, 717 N.E.2d 1, 4 (Ind. 1999)). In this context, a trial court "abuses its discretion when the probation conditions imposed are not reasonably related to rehabilitating the defendant and protecting the public." *Id.* (citing *Bratcher v. State*, 999 N.E.2d 864, 873 (Ind. Ct. App. 2013)). Thus, our review focuses on "whether imposed probation conditions 'reasonably relate to attaining these goals.'" *Id.* (quoting *Bratcher*, 999 N.E.2d at 873).

[50] According to Delgado, the Inmate Condition is "impractical" and may "run counter to his rehabilitation by, for instance, prohibiting him from certain lawful employment in the event a co-worker has a long-ago, minor conviction that resulted in incarceration." Appellant's Br. at 30–31. The State counters that the Inmate Condition "increases the rehabilitative efforts of probation to transform Delgado into a law-abiding citizen" and does not prevent Delgado from working with or being in the same location as a former inmate because these are "incidental contacts." Appellee's Br. at 31–32.

[51] While prohibiting Delgado from associating with former inmates may aid in his rehabilitation by limiting his exposure to people who engage in criminal activity, prohibiting him from associating with former inmates may also hinder his rehabilitation by limiting his exposure to people who no longer engage in criminal activity and actively help others to do the same. As written, without any exceptions for incidental contact, the Inmate Condition is overly broad and

thus not reasonably related to the goals of probation. We therefore conclude that the trial court abused its discretion in imposing the Inmate Condition.

### iii.The Driver's License Condition Is Not Reasonably Related to the Goals of Probation

[52] Delgado claims the Driver's License Condition is not reasonably related to the goals of probation because it allows the probation officer "unfettered authority to withhold permission for a driver's license," which "neither helps [Delgado]'s rehabilitation nor protects the public" because obtaining a driver's license "is important to his reintegration in society." Appellant's Br. at 32. In response, the State argues that the Driver's License Condition is necessary to ensure probation can provide an adequate level of supervision of Delgado based on his mobility.

[53] Here, Delgado was neither charged with nor convicted of any traffic-related offenses; in fact, Delgado's criminal history is devoid of driving-related offenses. We agree with Delgado that the opportunity to earn his driver's license will be important as he reintegrates into society, and we see no reason to limit that opportunity as set forth in the Driver's License Condition. We thus conclude that the Driver's License Condition is not reasonably related to the goals of probation such that the trial court abused its discretion by imposing it.

## Conclusion

[54] First, Delgado's convictions for resisting law enforcement and battery violate Indiana's protection against double jeopardy; we therefore reverse Delgado's

conviction for resisting law enforcement as a Class A misdemeanor, and we remand to the trial court with instructions to vacate this conviction. Second, the State did not present sufficient evidence to support Delgado's conviction for false informing as a Class A misdemeanor; we therefore reverse his conviction for false informing as a Class A misdemeanor, and we remand with instructions for the trial court to vacate that conviction and enter judgment of conviction and sentence Delgado on one count of false informing as a Class B misdemeanor[11]. Third, the trial court did not abuse its discretion by allowing the State to play the Post-Arrest Video for the jury; we therefore affirm the trial court on this issue. Finally, the Bad Reputation & Influence Condition is unconstitutionally vague, and the Inmate and Driver's License Conditions are not reasonably related to the goals of probation; we therefore reverse and remand with instructions for the trial court to clarify all three of these conditions with greater specificity.

[55] Affirmed in part, reversed in part, and remanded with instructions.


Weissmann, J., and Foley, J., concur.


ATTORNEY FOR APPELLANT

James Harper
Harper & Harper, LLC
Valparaiso, Indiana

---

[11] At oral argument, Delgado proposed this result as an appropriate remedy.

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana